Low v. Wortman.

PETER LOW, appellant,

*v.*

JOHN V. WORTMAN, respondent.

A father was justly indebted to his two children in an amount exceeding in value the farm which he conveyed to them in order to satisfy such debt— *Held*, that the validity of the conveyance could not be successfully assailed by a judgment-creditor of the father, although it was made while the father was prosecuting an appeal from the judgment obtained against him by such creditor.

On appeal from a decree advised by Vice-Chancellor Bird, who filed the following opinion:

This suit was instituted to enforce a judgment at law against the real estate of John V. Wortman, the debtor, which real

estate he had conveyed to his two children, Isaac and Mary. Prior to the conveyance the complainant had recovered a judgment for $427.26 against the defendant, John V. Wortman, for malicious prosecution. An appeal was taken from such judgment to the supreme court, and, during the pendency of such appeal, on the 15th of October, 1885, John V. Wortman conveyed all his real and personal estate to his said two children. Afterwards, and at the next term of the supreme court, the said judgment was set aside. Another suit was begun, and the judgment which the complainant now seeks to satisfy was recovered.

The complainant alleges that the said conveyance was fraudulent as to his judgment. The defendants, by their answer, and by their evidence as witnesses, declare the contrary, and insist that there was not only a good and valuable consideration for said conveyance, but that it was also *bona fide.* They state what the consideration was. As to Mary, they say that when she arrived at the age of twenty-one she insisted upon compensation for her services, and that her father gave her the profits of the milk, butter, eggs and poultry, and all that she could earn by sewing, over and above what was necessary to supply the family with groceries; that she proceeded under this arrangement for about nine years, and earned about $800, $569 of which she loaned to her father, and took his note therefor. This was about the year 1860. At the expiration of nine years there was a change made in the contract, when Mary agreed to work for $1 per week, and did so for about two years. It appears that during these two years she exacted no money from her father, nor did she have any accounting with him. At about the end of the said two years the wife of John V. Wortman was taken sick, and was more or less an invalid, and a considerable portion of the time thereafter, for about nine years, almost helpless. From the time the wife and mother were so taken sick, it is claimed that Mary was to have $2 per week. No other agreement was made between the father and the daughter, and no payments were ever made thereon, nor was there ever any accounting, although Mary continued to work for her father for

twenty-three years thereafter. With the interest, Mary makes her claim $4,096. She knew of the existence of the judgment against her father, and, although she believed it would be set aside, yet, if it was not, she said they expected to have it·to pay.

When Isaac became of age, according to the testimony of the defendants, he agreed to work for his father for $7 a month, and ·continued to work for him at that rate for two years, when his father agreed to give him $150 a year, at which price he con-·tinued in his father's employ for nine years, or until the time of his marriage. He claims for all of such service $1,518 of principal. He never demanded, nor did his father ever pay to him, anything ·for these services, nor was there ever any accounting between them. Neither in his case nor in Mary's was there any account kept against the father. Nor did the father keep any account. Matters so remained for at least twenty-three years with Isaac and his father as they had with Mary, and until after the judgment in the first suit against the father, when Isaac claimed the $1,518, and interest for the twenty-three years—in all, $3,612.84.

In addition to this claim for services, Isaac has certain promissory notes, amounting to $741, for moneys loaned, from time to time, to his father. Some of these amounts had been loaned for more than twenty years ; and, for some, if not all, new notes had been given. The whole claim of Isaac is (for services, $3,612.84 ; for money loaned, $741) $4,353.84.

The farm contained one hundred and four acres. The price agreed upon was $60 per acre—in all, $6,240. This price was paid by Mary surrendering her note for $569, making the whole amount due thereon $600, and by giving a receipt on account of the amount due for services for $2,520, and by Isaac surrendering his notes amounting to $900, and giving a receipt on account of the amount due for services for $3,120.

It will therefore be seen that Mary's claim was $4,096 ; Isaac's claim was $4,353.84—total, $8,449.84—while the sum allowed for the farm was $6,240, leaving still due Isaac and Mary $2,209.84. This balance was further reduced by a credit of $100 by Mary, upon an assignment, by the father, of his cows and poultry to her, and of $175 by Isaac, upon an assignment

of his undivided one-half interest in two horses to Isaac. The defendants insist that, in addition to this credit of $100 by Mary, and of $175 by Isaac, they agreed with their father to provide for him during his life, and upon his decease to pay his doctor bills, funeral expenses, and erect a suitable monument to his memory.

The testimony of the defendant Isaac shows that he left at least three years out of his calculation for services, at $150 a year. This he had not discovered until his attention was called to it, by way of cross-examination, so that if entitled to anything he was entitled to $450 more than he estimated, with interest. His testimony also shows that, while he was working for his father at the wages specified, he was engaged in other pursuits, on his own account, and accumulated about $800. Isaac married in 1866, and then rented the farm of his father. In order to accommodate both families, the father built a house for himself, allowing Isaac to live in the old one. Isaac continued to farm this land until 1877, paying about one-half the produce of the farm to his father, sometimes giving the grain and sometimes the money. During the time he was so farming, he had stock in partnership with his father, but the father says they never kept any account respecting it. During all of this same period, Isaac was the owner of about twenty-six acres of land adjoining the farm, which he cultivated at the same time with the farm. Isaac continued on the farm until 1877, when, on account of ill-health, he purchased a lot in Somerville, and built a dwelling-house thereon, and took possession of it. He borrowed $2,300 and secured it by mortgage on this lot.

According to the testimony of defendants, Mary worked for her parents for eight or nine years for the butter &c., as above stated, then for two years at $1 per week, and afterwards till the date of deed at $2. This increase from $1 to $2 per week was on account of the sickness of her mother. The mother died in 1873, when all that additional care and labor was removed, but there was no change in the compensation to be allowed Mary, nor is there any evidence that the subject was ever spoken of afterwards.

An aunt of Mary swore that she and Mary often talked upon the subject, and that she always understood from Mary that her father was paying her $1.  This witness appeared to be entirely worthy of credit.  She was a frequent visitor at Mr. Wortman's prior to 1880.  Mary denies this statement; or a least, that is the effect of her testimony; but, to remove the effect of it, in case it should be regarded as true, said that her aunt often told her that $1 per week was not enough, but that she must not tell her father that she said so, and adds that when her father promised her $2 per week he told her not to mention it.  The wife of complainant says that Mary told her, in 1883, that she was getting $1 a week.  This, too, Mary denies.

The father says that he did not settle with his children on account of these services, because he had nothing to pay them with.  Isaac says that he never insisted upon a settlement, because he knew if he did, Mary would also, and that his father could not pay them.

Not long before the execution of this conveyance, but while a settlement was in contemplation between Mary and her father, they called upon Isaac, and together the three consulted counsel. Mr. Wortman, the father, says that they talked of his making a will, but that they couldn't manage it in that way.  Mary corroborates her father in this.  Why it could not be managed does not satisfactorily appear.  The father, it is true, says that he wanted the matters settled between Isaac and Mary in his lifetime.  But there was nothing between Isaac and Mary.  There is no evidence that they had any dealings.  Up to that time all of the transactions had been between the father and Isaac on the one hand, and the father and Mary on the other.  Every one will perceive that the father could have executed a note or bond, or any other instrument, to his children, as proof of his indebtedness, and then executed a last will and testament.  There seems to have been no trouble as between themselves in ascertaining the amount due from the father to each of the children when they came to execute the deed.

Mary says that, when she would talk to her father about settling, he would tell her that he intended to do right by her, and

that he would treat them both equally. It is admitted by all
of the defendants that, while the negotiations for this convey-
ance were in progress, the judgment in favor of the defendant
(the one afterwards reversed) was the subject of conversation.
They say that they expected that that judgment would be set
aside. But Mary says that if it was not set aside, then it was
understood they would have it to pay.

The deed of conveyance was executed and delivered. Mary
and her father remained in the dwelling on the farm, and Isaac
took charge of the farm, continuing, however, to live in his
dwelling-house in the village. The father says that he continued
to be provided with every want afterwards the same as before
the conveyance.

The case, then, as made by the defendants, stands thus: When
Mary arrived at age she demanded compensation for her services,.
if she remained at home with her parents. A satisfactory ar-
rangement was entered into respecting the profits of butter &c.,
as stated above, which lasted for eight or nine years, but precisely
how long has not been established. At the end of this period
(both the father and brother being dissatisfied with Mary's accu-
mulations), she agreed to work for her parents at $1 per week.
Just when this period of service began has not been established ;.
nor has it been shown when it ended, except that it continued
until her mother was taken sick, which they say was about the
time that Mary had worked two years. When the mother was
taken sick, she insisted on an increase of wages, and her father
promised her $2 per week; but when this period began is very
uncertain. It has not been established. No date whatever is
presented. The witnesses say the butter and egg period con-
tinued about eight or nine years, the $1 per week period about
two years, and that the $2 per week period began about the
time the mother was taken sick. Neither party made any
memoranda or kept any account of these agreements.

Both Isaac and Mary loaned their father money at various
times—Isaac sometimes not more than $20—yet in every in-
stance a promissory note was exacted of the father; and, although
the father says these notes were sometimes allowed to become

Low v. Wortman.

outlawed, I understand Isaac to say that he was always careful to have them renewed. Therefore, in many transactions, the amount loaned and the time of the loan were preserved with absolute certainty, while the sums which they claim were earned by many years of service, and which more than quadrupled the amounts loaned, were left to the shifting or uncertain recollections of those who might chance to survive more than the ordinary period allotted to a generation of men. Isaac not only took notes of his father for money loaned and had them renewed, but, while renting the farm for eleven years (after the alleged eleven years of service), he frequently sold his father's share of the grain and received the money therefor. The money so received he always paid to his father. There is no intimation that he ever claimed the right to apply it to the account for services rendered so long before.

It next appears that the complainant in this suit obtained a judgment at law against the father for $427, from which an appeal was taken. The children were well informed of the pendency of this litigation. It was the subject of conversation at the time of the conveyance now in question. The defendants say they expected that it would be set aside. But Mary also says that if not set aside they expected to pay it. This shows a promise, express or implied, on the part of the children to the father, to pay this judgment, if not set aside; consequently, that much more must have entered into the consideration for the farm.

The father at first talked of making a will, but that could not be done satisfactorily. He then executed a deed of conveyance for all of his real estate to his children, and transferred to them all of his personal property. The defendants say that the real estate was conveyed without any condition, express or implied, but that the chattels were transferred on condition that they would take care of their father during his lifetime, pay his doctor's bill, bury him, and erect a monument to his memory. There was no writing taken at the time, or since, to show the exact nature of this obligation. The father was left in absolute insecurity. He had nothing whatever to protect him against

the death of his children, nor the many accidents or misfortunes which all are subject to. Thus, in the eighty-third year of his life, he allowed himself to be stripped of every earthly possession. But they say it was agreed that the father should be provided for. Of this I have not the slightest doubt. But I cannot conclude that this secret understanding grew out of or was limited to the transaction concerning the personal property. It seems to me most unreasonable to say that in these transactions, which evidently took place as soon as the one could follow the other, the father should hang all the happiness and comfort of his old age upon the transfer of goods and chattels valued at only $275, when at the same time he owned a farm valued at more than $6,000. Whatever may have been the form, or method, or order of events, or language used, I am irresistibly drawn to the conclusion that the secret trust grew out of and extended to the real estate transaction. There was a conveyance, absolute on its face, with a secret understanding between the parties of great benefit to the grantor. If I am right in this conclusion, then the case is controlled by that of *Scott* v. *Hartman*, *11 C. E. Gr. 89*, in which Chancellor Runyon decided that a debtor, in failing circumstances, will not be permitted to sell his land, convey it by deed without reservation, and yet secretly reserve to himself the right to possess and enjoy it, though for a limited time only, for his own benefit. The rule will not be changed by the fact that the right thus to occupy the property is a part of the consideration of the sale. *Sayre* v. *Fredericks, 1 C. E. Gr. 205, 208.*

Every such secret trust is a badge of fraud. Every such trust between grantor and grantee is in truth, as to all the creditors, a fraud, for they are thereby defeated and defrauded. See *Twyne's Case, 3 Co. 80; Bump on Fraud. Con. 83.* An instrument which misrepresents the transaction that it recites is evidence of a secret trust, and is calculated to mislead and deceive creditors. *Divver* v. *McLaughlin, 2 Wend. 596.* The law looks with great jealousy upon the manner of giving preferences, and denounces all departures from good faith, and requires that the parties shall

Low v. Wortman.

not secure any covert advantage to the debtor in prejudice of his creditors. *Bump on Fraud. Con. 224.*

In this case, it will be perceived, the debtor transferred all his property, both real and personal, to his children; this is regarded as a badge of fraud. *Scott* v. *Hartman, supra ; Bump on Fraud. Con. 79; Sayre* v. *Fredericks, 1 C. E. Gr. 205; Venable* v. *United States Bank, 2 Pet. 107; Hoboken Bank* v. *Beckman, 9 Stew. Eq. 83.* It has frequently been decided that the conveyance of a debtor's estate during the pendency of a suit against him is a badge of fraud. *Bump on Fraud. Con. 81; Venable* v. *United States Bank, supra ; Stoddard* v. *Butler, 20 Wend. 507; Jackson* v. *Mather, 7 Cow. 301, 303; Callan* v. *Statham, 23 How. 477.*

Again, under the circumstances of this case, the consideration can scarcely be considered good and valuable. The farm was valued at $6,240. Mary's claim for money loaned and interest was $600; Isaac's claim for money loaned is $741, making in all $1,441, the balance of the consideration being the amount alleged to be due for services. This can only be regarded as fictitious so far as the complainant is concerned, and consequently a badge of fraud. Isaac's claim for services had been standing over nineteen years, so that every part of it had been within the statute of limitations since the year 1872. Mary's claim for services had been running for at least twenty-three years, so that all of it covered by the first seventeen years was outlawed. The case of *Luers* v. *Brunjes, 7 Stew. Eq. 19 ; S. C. on appeal, Id. 561,* is quite in point, and so are also the cases cited by the Chancellor in that case. If I am right in this conclusion, then the whole transaction is vitiated and must be set aside, as in the case of *Heintze* v. *Bentley, 7 Stew. Eq. 562,* in which the court held that if a mortgage, given to secure a debt actually due, be drawn for a larger sum, with intent on the part of the mortgagor and mortgagee to delay, hinder or defraud the creditors of the mortgagor thereby, it will be adjudged void at the instance of those creditors, and will not be allowed to stand against them, even as security for the real debt. *Demarest* v. *Terhune, 3 C. E. Gr. 532.*

Besides the foregoing considerations, two witnesses say that

Isaac said, on being spoken to with reference to the second judgment recovered by law against his father, as to that "they had all things fixed." Isaac qualifies this by saying that what he meant or said was that he and Mary had bought the farm.

It seems to me that, if I follow the adjudications in such cases, I must advise that the said deed of conveyance be declared void as to the complainant's judgment. The complainant is entitled to costs.

*Messrs. Voorhees & Cotter,* for appellants.

*Mr. R. V. Lindabury,* for respondent.

The opinion of the court was delivered by

BEASLEY, C. J.

This was a bill filed by a judgment creditor to vacate a conveyance of real estate made by a father, the defendant in the judgment, to his two children. The ground for relief was that such transfer was void under the statute, its purpose having been to hinder and defraud creditors. It was in this light that the affair was viewed by the Vice-Chancellor, and the property was, accordingly, subjected to the judgment.

In this construction of the evidence this court cannot concur. We think it plain that there was a debt justly due from the father to these children to an amount exceeding the value of the property conveyed to them. They had for a long time looked to this property, and when they found the respondent pressing his suit against their father they had a right, as creditors, to secure a preference. This is what was done, and the act was not illegal or unjust.

Let the decree be reversed, with costs.

*For affirmance*—THE CHANCELLOR, MAGIE, REED, VAN SYCKEL, CLEMENT, McGREGOR—6.

*For reversal*—THE CHIEF-JUSTICE, DEPUE, DIXON, KNAPP, SCUDDER, BROWN, COLE, PATERSON, WHITAKER—9.